IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| HAL HICKS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2004-CV-4263-JPG |
| | ) | |
| MIDWEST TRANSPORT, Inc. d/b/a, | ) | |
| MIDWEST TRANSPORT OF ILLINOIS, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

**GILBERT, District Judge:**

This matter comes before the Court on Defendant Midwest Transport's motion to dismiss this case for lack of subject matter jurisdiction, see FED. R. CIV. P. 12(b)(1), or, in the alternative, stay these proceedings (Doc. 5), to which Plaintiff Hal Hicks responded (Doc. 11) and Midwest Transport replied. (Doc. 12). For the reasons discussed below Midwest Transport's motion will be **DENIED**.

This Court is well acquainted with the parties to this case so only the relevant facts will be recounted here. Plaintiff, Hal Hicks, is in the transportation business. In the 1990s, he teamed up with C. Michael Witters and Diane Witters, who are married to each other, and started Midwest Transit, Inc., an Illinois corporation formed to fill the United States Postal Service's need for over-the-road contract mail delivery services. Hicks owned fifty percent of Midwest Transit's stock; the Witters together owned the other fifty. Significantly, Hicks was placed in charge of day-to-day company operations. But that turned out to be a decision which, as Judge Evans has written in another context, "[i]n retrospect . . . looks a lot like Mister Burns' determination that

Homer Simpson would make a fine nuclear safety inspector." *Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co.*, 200 F.3d 1102, 1105 (7th Cir. 2000). That's because, in short order, the Witters suspected Hicks of mismanaging corporate assets. Their main concern was Hicks's apparent practice of converting assets from company use to his own personal use. Suspicions in hand, and with the help of a lawyer, the Witters petitioned the Circuit Court of Lawrence County, Illinois for an order removing Hicks as manager of Midwest Transit and appointing a custodian in his place–a move which Illinois law gave them every right to do in their capacity as shareholders. 805 ILCS 5/12.56(a). Following careful consideration of the petition, Illinois Circuit Judge James Hill granted the Witters' wish and appointed Donald Hoagland as custodian. These and other details are cogently explained in the Illinois appellate court's published opinion in *Witters v. Hicks*, 780 N.E.2d 713 (Ill. App. Ct. 2002) (*Hicks I*). Subsequent legal proceedings led the circuit court to conclude that Midwest Transit was beyond repair and should be liquidated forthwith. That ruling was the subject of another Hicks appeal and another published state-court opinion. See *Witters v. Hicks*, 790 N.E.2d 5 (Ill. App. Ct. 2003) (*Hicks II*). For what it's worth, the Court notes that the parties haven't told us what the status of the state-court litigation is–and that's a fact which weighs heavily in the Court's disposition of the motion to stay, as we'll see when we get to the end of this Order.

      That said, now comes the really important part. In carrying out his duties as liquidating receiver, Hoagland sold most if not all of Midwest Transit's assets to the defendant in this case: a concern named Midwest Trans*port*, not to be confused with Midwest Trans*it*. One such asset (or perhaps it was "Hicks's asset"–that's the issue Hicks raises in this case) was a Postal Service contract the parties refer to as the Buffalo route–or H.C.R. No. 14024, in postal parlance–which

Midwest Transport continues to service to this day without Hicks's assistance. It's been undisputed all along that the documents memorializing the Buffalo route deal were executed between the Postal Service and Hicks alone; Midwest Transit's name just isn't there. So under normal circumstances at least, probably most jurists would be tempted to presume that Hicks–and Hicks alone–owned the Buffalo route outright. After all, the written contract itself, supposedly the best evidence of the deal, was indisputably executed by Hicks alone, right? And so Hicks argues, though Midwest Transport points out that there's more to the story than what we've said thus far. For one thing, there is the Illinois appellate court's first published opinion in this case. There the court observed, "Hicks acknowledges that several [Midwest Transit] trucks are used to operate the Buffalo route." *Hicks I*, 780 N.E.2d at 720. Moreover, the appellate court added, "[Midwest Transit] pays for all fuel and other operating costs." 780 N.E.2d at 720. So given that the Buffalo route was maintained all along in Hicks's name and that "[s]ince the beginning of the present suit, Hicks retained the revenue from the route, although it continues to be operated by [Midwest Transit] and at [Midwest Transit's] expense," Hicks's conduct evidenced to that tribunal "exactly the type of commingling of personal and corporate assets that justifies the appointment of a receiver." 780 N.E.2d at 720. Thus, Midwest Transport draws two conclusions from *Hicks I* on which it bases this motion to dismiss. First, it sees *Hicks I* as a conclusive adverse decision against Hicks on the claim he's asserted in this case. As such, Midwest Transport reasons, this Court–a court of federal *original* jurisdiction, not *appellate* jurisdiction–must dismiss Hicks's claim under the doctrine set forth in *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983). And if that doesn't fly, Midwest Transport continues, then Hicks's claim in this case is

barred by the affirmative defense of res judicata. On this note Midwest Transport refers us to language in *Hicks I* where the court, after enjoining the parties in that case from interfering with Hoagland's (who again was Midwest Transit's receiver) control of Midwest Transit, including "all income generated by the Buffalo route," wrote that "[w]ith respect to the . . . income generated from the Buffalo route, the evidence demonstrates that such *revenue* properly belongs to [Midwest Transit]." 780 N.E.2d at 721 (emphasis added).

Let's tackle the *Rooker-Feldman* argument first. Before getting too far afield the Court notes in fairness to Midwest Transport that the United States Supreme Court decided *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 125 S. Ct. 1517 (2005), after briefing was completed in this case. *Exxon* clarified the contours of *Rooker-Feldman* to the extent that it's debatable whether Midwest Transport would have made this argument at all were it with the benefit of that decision prior to making the motion. Be that as it may, let's begin our analysis with the applicable legal principle, stated by *Exxon* as follows:

> The *Rooker-Feldman* doctrine, we hold today, is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments. *Rooker-Feldman* does not otherwise override or supplant preclusion doctrine or augment the circumscribed doctrines that allow federal courts to stay or dismiss proceedings in deference to state-court actions.

*Exxon*, 125 S. Ct. at 1521-1522. As applied to this case, *Exxon* suggests that a threshold problem with Midwest Transport's current position is that the state-court decisions Midwest Transport cites in support of its motion fail to reveal any state-court judgment "rendered [on this claim] before the district court proceedings commenced." As discussed in further detail below, *Hicks I* explored whether the appointment of a receiver was appropriate in the first instance, and *Hicks II*

was even further afield. Indeed, here's how *Hicks I* described the issues involved in that appeal: "Hicks appealed the trial court's order appointing Hoagland as receiver. He also filed an interlocutory appeal of the trial court's order denying his motion to vacate the orders of attachment. This court ordered the appeals to be consolidated for purposes of the record, arguments, and disposition." *Hicks I*, 780 N.E.2d at 716. Even more fundamentally, Midwest Transport fails to explain how Hicks's current lawsuit could be characterized as "inviting district court review and rejection" of any state court judgment. Note that in order for this case to fit within *Rooker-Feldman*, one would have to be capable of characterizing Hicks's claim in this case as an appeal of a state-court judgment. In other words, the relief Hicks would necessarily seek from this Court would be vacatur of a state-court judgment, in some form or another, e.g., perhaps because the statute applied against him in those proceedings was unconstitutional. Such a claim would only be fair game for an appeal, but it's a far cry from the claim Hicks makes in this case. *Rooker*'s description of the district court "claim" at issue there underscores this view.

> A reading of the entire bill shows indisputably that there was full jurisdiction in the state court and that the bill at best is merely an attempt to get rid of the judgment *for alleged errors of law* committed in the exercise of that jurisdiction.

263 U.S. at 416 (emphasis added). Similarly, *Feldman* described its claim as follows:

> It is clear that [the plaintiffs'] allegations that the District of Columbia Court of Appeals acted arbitrarily and capriciously in denying their petitions for waiver and that the court acted unreasonably and discriminatorily in denying their petitions in view of its former policy of granting waivers to graduates of unaccredited law schools . . . required the District Court *to review* a final judicial decision of the highest court of a jurisdiction in a particular case.

460 U.S. at 487 (emphasis added). In this case, by contrast, note that Hicks stated his prayer for relief as follows–and it's a characterization this Court has been given no reason to question:

> WHEREFORE, Hal D. Hicks, respectfully prays that this court enter judgment in

> his favor for conversion [and] that Mr. Hicks be awarded all damages incurred to date, that a constructive trust be award[ed] Mr. Hicks for the reasonable profits made on Highway Mail Contract 14024, and that this court return Highway Mail Contract 14024 to Mr. Hicks' possession and control, and for any other relief this court deems just and proper.

(Doc. 1 at 5). Whatever the merits of Hicks's claim, it clearly cannot be fairly characterized as an attack on any state-court judgment *qua* judgment based on the materials presented to this point.

On to res judiciata. The parties both agree on the governing legal principle, including the requirement that the former adjudication have reached a final judgment on the merits of the claim at issue in the second case. *Garcia v. Village of Mount Prospect*, 360 F.3d 630, 635 (7th Cir. 2004). Indeed, this is exactly where Midwest Transport's argument fails; for as Hicks suggests, that no state court explicitly declared Midwest Transit the owner of the Buffalo route is difficult to get around. As the Court hinted above, *Hicks I* merely addressed the propriety of appointing a receiver to relieve Hicks of his duties as Midwest Transit's managing shareholder. Thus, the state court's discussion of Hicks's conduct relative to the Buffalo route was only relevant to the extent it suggested Hicks was "act[ing] in a manner that is illegal, oppressive, or fraudulent with respect to the petitioning shareholder whether in his or her capacity as a shareholder, director or officer;" 805 ILCS 5/12.56(a)(3), or perhaps whether Midwest Transit's assets were "being misapplied or wasted." §5/12.56(a)(4). Note that a principal concern in *Hicks I* was the "commingling" of assets. BLACK'S LAW DICTIONARY 264 (7th ed. 1999), defines commingling as "[a] mixing together; esp., a fiduciary's mixing of personal funds with those of a beneficiary or client." So on some level at least, *Hicks I* believed that personal (i.e., separate) property was involved in the commingled Buffalo route account. It's therefore safe for us to infer that the state appellate court thought Hicks retained some ownership interest therein. If not, why would the appellate court

describe the problem before it as a "commingling" of assets?  Moreover, one mustn't ignore the context of *Hicks I*.  It's axiomatic that the decision whether to order a corporation into receivership is an equitable judgment, 16 FLETCHER'S CYCLOPEDIA OF PRIVATE CORPORATIONS §7671 (1999 & supp. 2005), and considerations of equity include fairness and preservation of the status quo–the latter a concept particularly relevant in *Hicks I* since the appellate court was also presented with a preliminary injunction entered by the state circuit court.  This context is important because it explains the circuit court's judgment (affirmed by the appellate court) "enjoining" the parties from "diverting any funds away from the corporation and its accounts," including "all income generated by the Buffalo route," and also the appellate court's statement–again, written in the context we've just described–that all "income generated from the Buffalo route . . . properly belongs to [Midwest Transit.]" *Hicks I*, 780 N.E.2d at 721.  In the final analysis, this language simply reflects the state courts' preliminary judgments to maintain the status quo pending the final resolution of that case.

     All this is not to say, of course, that Midwest Tranport's instincts might not be correct.  That's why the Court hinted that Midwest Transport's motion is denied based on the information presented up to this point.  Indeed, it's hard to believe that the Illinois circuit court–and the Postal Service, for that matter–would've stood by or actively participated in a novation which allegedly erroneously assumed Midwest Transit owned the Buffalo route when that route was in fact owned by Hicks.  If the Buffalo route was Hicks's personal property, perhaps Illinois law required him to make a claim with the circuit court on pain of losing the claim forever.  See, e.g., 805 ILCS 5/12.75.  Alternatively, maybe some other state-court decision exists which squarely resolves Hicks's rights to the Buffalo route vis-a-vis Midwest Transit.  So to the extent these

considerations apply, Midwest Transport is invited to move for summary judgment later.

In closing, the Court will address Midwest Transport's request for a stay of these proceedings pending a ruling on a motion for summary judgment Midwest Transport filed in a parallel (we'll assume it's parallel for the sake of argument) state court case.  In a nutshell, the Court finds that a stay here would be inappropriate.  At this point (again, without knowing the status of the state-court litigation relating to the liquidation proceedings) the only conceivable basis for granting a stay in this case is the abstention doctrine set forth in *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976).  But that doctrine is principally based on the notion that it's a waste of judicial resources to litigate a parallel case when another case is on the cusp of a final judgment and much time and effort has been expended in getting to that point.  Simply put, the filing of one motion for summary judgment just doesn't fit the bill.

## CONCLUSION

Midwest Transport's motion to dismiss Plaintiff's complaint, or in the alternative, motion to stay proceedings (Doc. 5) is **DENIED**.  Per FED. R. CIV. P. 12(a)(4)(A), Midwest Transport's answer to Plaintiff's complaint is due within 10 days of service of this Order.

**IT IS SO ORDERED.**

**Dated: May 16, 2005.**

                                                  **/s/ J. Phil Gilbert**
                                                  **J. PHIL GILBERT**
                                                  **U.S. District Judge**